MOORE v. MITCHELL.

1. Principal and Agent—Husband and Wife—Evidence.
   In suit by woman against brokerage firm for sum of money, alleged to have been advanced to it through its customers' man, evidence *held*, sufficient to sustain contention that plaintiff's husband was acting as her agent and that she had nothing to do with the transaction except to furnish the money, hence all notice or other defenses good as to husband have equal force as against plaintiff.

2. Brokers—Nature of Business—Over the Counter Transactions.
   A brokerage firm dealing in securities may execute orders of its principal for an agreed compensation by way of commission or it may sell to a customer securities which it owns; so-called "over the counter transactions" not having a meaning known to the court as a matter of law.

3. SAME—FRAUD BY CUSTOMER AND FIRM'S CUSTOMERS' MAN.

Transaction whereby plaintiff allegedly advanced a sum of money to be used in financing purchase of certain securities on behalf of another client of defendant brokerage firm and profit therefrom to be split between firm, its customers' man and plaintiff *held,* fraudulent as a matter of law.

4. PRINCIPAL AND AGENT—RATIFICATION.

Ratification by principal may only take place with full knowledge of the facts concerning agent's dealings with third parties.

5. BROKERS—RATIFICATION—ADMISSION OF LIABILITY—PRINCIPAL AND AGENT.

Admission of liability by member of brokerage firm, for alleged fraud of its customers' man, made before plaintiff had made such member fully aware of entire transaction *held,* not a ratification of such agent's acts where complete disclosure would have shown participation in fraud by plaintiff through her own agent.

6. SAME—FRAUD—CUSTOMERS' MAN—APPARENT AUTHORITY.

Transaction whereby the only possible result would be to work fraud upon a client of brokerage firm employing customers' man *held,* as a matter of law, not within apparent authority of such an agent, in plaintiff's action against firm for moneys alleged to have been advanced to it through such customers' man.

7. SAME—FRAUD—VIOLATION OF LAW—LIABILITY OF SURETY.

Transaction whereby plaintiff, one client of defendant brokerage firm, would perpetrate a fraud upon another of the firm's clients through scheme of a so-called customers' man in its employ, which transaction was not in the regular course of defendant's business nor within actual or apparent authority of such customers' man who has since disappeared, *held,* not to entitle plaintiff to recover from defendant or surety on its statutory bond sum advanced to such agent on basis that such transaction was in violation of securities act as brokers are not insurers of every transaction of their salesmen (2 Comp. Laws 1929, § 9769 *et seq.,* as amended by Acts Nos. 229, 255, Pub. Acts 1931).

8. LICENSES—BLUE SKY LAW—LIABILITY OF STATUTORY SURETY.

Surety on dealer's statutory bond, given under securities act, is intended to afford protection only to innocent members of the public, hence plaintiff, who participated, either as principal

or joint adventurer with customers' man employed by defendant brokerage firm in scheme to defraud another client of the firm in violation of statute without knowledge of firm, may not recover from surety (2 Comp. Laws 1929, § 9790, as amended by Act No. 229, Pub. Acts 1931).

Appeal from Wayne; Miller (Guy A.), J. Submitted October 16, 1936. (Docket No. 26, Calendar No. 38,896.) Decided December 8, 1936.

Action by Ipsa Louise Moore against Leeds Mitchell and others, copartners, doing business under the name and style of Winthrop, Mitchell & Company and Saint Paul Mercury Indemnity Company of Saint Paul, a corporation, for sums due on an alleged brokerage transaction. Verdict for plaintiff. Judgment for defendants *non obstante veredicto.* Plaintiff appeals. Affirmed.

*Alex. J. Groesbeck* and *Hugh Francis,* for plaintiff.

*Lightner, Crawford, Sweeny, Dodd & Toohy* (*Clifford M. Toohy* and *George D. Haller,* of counsel), for defendants.

BUTZEL, J. Winthrop, Mitchell & Company, hereinafter referred to as defendants, were members of the New York, Chicago and other stock exchanges. On July 10, 1933, they opened a Detroit office with Earle A. Gardner as branch manager, succeeding the firm of Harris, Winthrop & Company which previously had a branch in Detroit. The latter had employed one John W. Adams as a telegraph operator in its New York office. Subsequently, Adams was employed by the Detroit branch of Whitehouse & Company, a large New York stock exchange house, where he met plaintiff's husband, John E. Moore, of Detroit. Moore was connected with several corpo-

rations and had considerable experience in dealing in stocks and commodities through brokerage houses. He had bought on margin, and had also "sold short." Upon Gardner's recommendation, Adams was employed by defendants on July 10, 1933, as a "customers' man" to contact customers, accept orders, at times to collect payments and, when so requested, to see customers at their offices. Adams occupied a desk in one of the private rooms in defendants' suite of offices. On the written recommendation of Gardner, Adams secured a license as a salesman from the Michigan securities commission, the license remaining in possession of defendants. They had confidence in Adams and believed that he would carry on only transactions authorized by them. Defendants, as obligors, had given a bond in the sum of $10,000 with the Saint Paul Mercury Indemnity Company of Saint Paul, co-defendant surety herein, in accordance with Act No. 220, § 22, Pub. Acts 1923, amended by Act No. 136, Pub. Acts 1929,* conditioned upon the faithful compliance with the provisions of the blue sky law (2 Comp. Laws 1929, §§ 9769–9803) by defendants and all of their registered salesmen.

Moore, who in previous years had dealt with at least four different stockbrokers' offices, usually on margin, was accustomed to receive monthly statements showing transactions for that period and also confirmation of sales and purchases after each transaction. It was the usual procedure for Moore each month to go over his Winthrop, Mitchell & Company account with Walter Flannery, who at one time was Detroit branch manager for Harris, Winthrop & Company and who held a personal power of attorney from Moore addressed to defendants. Flannery had

---

\* This section (2 Comp. Laws 1929, § 9790), was also amended by Act No. 229, Pub. Acts 1931.—REPORTER.

a personal interest in the Moore account and had also been connected with the firm of Whitehouse & Company with whom Moore had previous dealings. The record does not clearly indicate Flannery's relation with defendants.

In August, 1933, Moore entered into a mysterious "sugar deal" with Adams and in that connection gave him a check dated August 24, 1933, for $10,125, payable to Moore and indorsed in blank. Moore claims that he received a receipt similar to the one hereinafter set forth, designated as exhibit 6; that he either destroyed or lost it and that it was written in longhand. If the receipt which Moore claims he received was similar to the one involved in the present litigation, it also must have borne a forged signature. Within two weeks after delivering the check, Moore received from Adams a check for $11,812.50 drawn by Whitehouse & Company, payable to F. F. Beall and indorsed in blank by the latter. Defendants never knew of this deal. They neither received nor paid out any money in regard to it nor had anything to do with it. They were total strangers to the transaction, except for the fact that it was carried on, without their knowledge or consent, by Adams, their employee.

Moore claims he did not know that this unusual transaction was one in which defendant firm took no part notwithstanding the fact that he received the check made out to Beall and signed by Whitehouse & Company, and all of the other suspicious circumstances. He received no confirmation of the transaction; the original check Moore gave was not payable to defendants and the monthly statement of September 1, 1933, sent by defendants to Moore contained no mention of this deal. Moore never mentioned the transaction to any of defendants. He contends that he had a right to assume that when

one of defendants' customers' men dealt with him, defendants were charged with knowledge of the facts. Plaintiff claims this "sugar deal" was similar to the one out of which the present litigation arose. About September 4, 1933, Adams telephoned Moore and proposed the second "sugar deal" similar to the one he was completing and from which Moore would again realize a second profit amounting to $1,687.50. The following day, Adams went to Moore's office and brought him the Whitehouse & Company check for $11,812.50 from the first "sugar deal." He explained to Moore that the "sugar deal" necessitated Moore's advancing a large sum of money; that defendant firm had a customer who was desirous of acquiring a large block of Michigan sugar stock; that in order to prevent advancing the price of the stock through an unusual demand from one firm of brokers, it was necessary to employ outside brokers; that Shader, Winkler & Company would be so employed and the stock so acquired would then be sold at a profit to defendant firm and the profit thus derived at the client's expense would be divided among defendant firm, Moore and Adams. Had defendants carried on such a transaction, they would have made a fraudulent secret profit at the expense of their client.

Moore agreed to enter into this second scheme and gave Adams his check for $10,125 dated September 7, 1933. Moore stated that he wanted the deal to be in the name of his wife, Ipsa Louise Moore, the moneys representing sums belonging to her, plus an amount that Moore was giving her. The testimony bears out the contention that Moore was acting as agent for plaintiff and that she had nothing to do with the transaction except to furnish the money in the manner stated. All notice or other defenses good as to Moore have equal force as against

plaintiff.   Adams gave Moore exhibit 6.   It was
written on a printed form of defendants, the words
italicized being written in and the balance being
printed.

Exhibit 6.
"Winthrop, Mitchell & Co.
Chicago, <i>Sept. 7,</i> 1933

"*Ipsa Louise Moore,*
"*Red Oaks,*
"*North Cranbrook Rd.,*
"*Birmingham.*
"Dear Sir:
"We have credited your account this day with *ten
thousand one hundred twenty five dollars to be ap-
plied against sugar deal.   When deal completed
eleven thousand eight hundred twelve dollars and
fifty cents to be returned to you.*

·"Yours very truly,
"Winthrop, Mitchell & Co.
"Per   <i>F. Oppet.</i>"

The receipt is a forgery, Oppat's name not even
having been spelled correctly.   No time was men-
tioned as to when the deal was to be completed or
the $11,812.50 paid to plaintiff.   No confirmation of
the deal was sent to plaintiff or Mr. Moore nor was
any account opened with defendant firm by Mrs.
Moore.   Moore knew the custom of brokerage houses
to send confirmations and statements.

Moore stated that Adams "was rather indefinite
about the length of time 'my' money was to be out
but he said not to exceed 10 days," and in referring
to himself, said:

"I was financing the sugar deal but as to who was
to obtain the benefit of the financing I would like to
find out myself."

Moore never saw Adams after September 7, 1933.
He telephoned him shortly thereafter and was told

that the deal was progressing. Adams has never been seen by any of the parties since September 14, 1933, when he disappeared after telling Gardner he had to go to Chicago. On September 18th, Moore went to defendants' office and learned of Adams' disappearance. Moore returned for a conference at which there were also present, Gardner, defendant Illian, a member of defendant firm, and an attorney for the defendants. Moore stated that he had opened an account for his wife the previous week with Adams to whom he had turned over $10,125. Gardner told Moore that he knew nothing of the transaction and that the check had never been received by defendants. It developed that this second check also had been made out to Moore, indorsed by him in blank and cashed by Adams. Moore testified that he did not recall whether the check for the September "sugar deal" was produced at the conference; but Illian emphatically denied that the check was produced. Moore promised, however, to give defendant firm a photostatic copy of the receipt which Adams had given him. There is a conflict in the testimony as to what occurred at this conference. Something was said about defendant firm being bonded; that the surety company had received large premiums, could afford to pay the loss and that it would be paid. The record shows, however, that all the facts and details of the entire transaction were not disclosed at the conference. It appears that Adams' dishonesty was not limited to this single transaction. Defendants refused to pay and plaintiff brought the instant suit.

Before the case was submitted to the jury, defendants' motion for a directed verdict was denied. They gave notice that in the event of an adverse verdict, they would ask for a judgment *non obstante veredicto*. The jury brought in a verdict for $11,812.50,

the full amount of the advance plus the profit. Plaintiff concedes that this amount should be reduced to $10,125. We have only given an outline of the testimony. Additional facts appear in the opinion of the judge who, in granting the motion for judgment notwithstanding the verdict, so well summed up the facts and the law that we adopt the following from it:

"Plaintiff's action is based upon a receipt, the important words of which are as follows:

" 'Dear Sir: We have credited your account this day with $10,125, to be applied against sugar deal. When said deal is completed, $11,812.50 to be returned to you.'

"There is nothing in the document to explain what the sugar deal was. It was therefore open to explanation by testimony, and plaintiff's own testimony is the sole light upon that part of the transaction. His explanation was vague, but it substantially was set forth in the testimony which is quoted verbatim on pages 26 and 27 of plaintiff's brief.

"It was not a brokerage transaction. The money was not given to Mr. Adams for the purpose of buying stock. Winthrop, Mitchell & Company were not to receive a commission. On the contrary, Mr. Moore testified many times that he was advised that it was an 'over the counter transaction.' It seems to be assumed by plaintiff that this is a phrase which has a meaning. If so, that meaning is not known to the court as a matter of law. Nowhere in the testimony is there any definite statement as to what an over the counter transaction is in the brokerage business. As a matter of fact, there are only two kinds of dealings in which a brokerage firm can take part. It can act as a broker, in which case it is acting merely as an agent, executing the orders of its principal for an agreed compensation by way of commission. This transaction was not such a transaction. Or, the brokerage firm can sell securities which it owns to its customer.

"In this case it is not acting as a broker but is acting as a principal in a sale of commodities. Such a transaction is not illegal, so long as it is known by both parties to be such a transaction. It would become illegal and fraudulent if the brokerage firm represented to its client that it purchased securities for him on the open market, and was being compensated by the receipt of a commission, when in point of fact it was selling to him securities which it owned. The transaction involved in this case was neither the purchase of stocks for commission as a broker nor the outright sale to Mrs. Moore of stocks that the brokerage firm owned.

"Upon Mr. Moore's own testimony, the transaction was as follows: Adams told him that Winthrop, Mitchell & Company had a client named Beall who was accumulating Michigan sugar stock. He represented that in order to avoid unduly enhancing the market price, it was necessary to make purchases in other names than Mr. Beall's name, and that the $10,125 would be used to purchase sugar stock which would subsequently be turned over to Mr. Beall. When it was turned over to Mr. Beall the sugar deal would be closed, and when that happened Mr. Moore was to receive back $11,812.50, neither more nor less. The difference between the two amounts represented Mrs. Moore's profit on the transaction, and that was only a part of the profit which was to be involved. This point is proved by Mr. Moore's answer:

"*'A.* He said, "If there was a profit, that would accrue to me, to Winthrop, Mitchell & Company, and to himself."'

"This profit would presumably be divided equally, in which event it would amount to very close to $5,000. If so, Mr. Beall would be paying in the neighborhood of $15,000 for stocks which were purchased with Mrs. Moore's $10,125. If such a transaction would not be fraud perpetrated upon Mr. Beall by his brokers, then this court is unable to comprehend what does constitute fraud.

"The tale which Mr. Moore says Mr. Adams gave him about the necessity of purchasing stock in another name than Mr. Beall's in order to avoid boosting the price of sugar stock, is patently ridiculous, and must have been known to be so by Mr. Moore, who is a man who is not lacking in business experience.

"Stocks which are purchased on the Detroit stock exchange, or any other exchange, are purchased by brokerage houses. The names of their customers are not divulged when the purchase is made.

"If Mr. Adams made any such statement, and if Mr. Moore believed it, then Mr. Moore is possessed of a perfectly incredible amount of credulity.

"The more consideration this case receives the more firm is the conviction of the court that any such transaction, as Mr. Moore says this was explained to him to be by Mr. Adams, would work a fraud upon Mr. Beall, and must have been known by Mr. Moore to be of such a nature.

"It is argued that Mr. Illian ratified the transaction, and therefore bound the defendant partnership.

"There is no evidence that at the time when the conversation between Mr. Illian and Mr. Moore took place Mr. Illian had any knowledge as to its claimed nature. The utmost that the testimony discloses is that the receipt and the check were exhibited to him. It is elemental law that ratification only takes place with full knowledge of the facts. Under the testimony, the plain inference from the facts in possession of Mr. Illian was that this money was handed to Adams in order that it be used by Winthrop, Mitchell & Company to purchase stocks. If such had been the nature of the transaction, the defendant partnership would have been liable. See *Timmerman* v. *Bultman,* 243 Mich. 344.

"Mr. Illian's admission of liability, under the circumstances, was a perfectly correct legal conclusion, from the facts which were before him. What he

would have done had Mr. Moore disclosed to him the full conversations which he claims to have had with Adams we do not know and are not permitted to guess. There can be no successful claim of a ratification based upon that conference with Mr. Illian.

"It is claimed that this transaction was within the apparent scope of Adams' authority. I do not think that it can successfully be argued as a matter of fact or law that it is within the apparent scope of an agent's authority, to enter upon a transaction the only possible result of which is to work a fraud upon one of the clients of the firm by which he is employed.

"It is argued that this transaction is one which comes within the prohibition of the Michigan securities act.* I think it is. It is further argued that because that is so the defendant brokerage firm is liable.

"The act does not make a dealer in securities an insurer of every transaction of its salesmen. If it did, and if such an enactment were to be held valid, then all of the discussion about implied authority in this case would be beside the point. Since it does not, no argument as to the liability of the defendant partnership can be based upon the statute unless in some way it can be connected with the apparent scope of Adams' authority. I know of no law which permits the apparent scope of an agent's authority to be so extended as to include transactions which are not only fraudulent in themselves but are also prohibited evils, made so by express statutory enactment. It is not to be presumed, and I do not think that there is any evidence in this case to warrant a jury or the court in coming to the conclusion as a fact that this defendant partnership clothed Adams with apparent authority to perpetrate, by connivance with one customer of the firm, a fraud upon another customer of the firm, in a transaction

---

* See 2 Comp. Laws 1929, § 9769 *et seq.*, as amended by Acts Nos. 229, 255, Pub. Acts 1931.—REPORTER.

which is directly prohibited by the provisions of the Michigan securities act. Such conduct would lead, inevitably, to the exclusion of the firm itself from the transaction of business in the State of Michigan, and equally inevitably it would lead to the expulsion of the firm from membership in every reputable stock exchange in the United States.

"Finally, it seems to be the only legitimate conclusion in this case that Adams had no actual authority to enter upon this transaction; that the transaction as testified to by Mr. Moore was not within the apparent scope of his authority; and that it was not subsequently ratified so as to bind the defendants."

The present case is largely one of fact. To recover, plaintiff must show that defendant firm was bound by the acts of Adams, its agent, and that the loss is covered by the bond given to the securities commission. If the fraud had arisen out of fraudulent conduct in the purchase or sale of securities in the regular course of business, defendants undoubtedly would be liable. While appellant has stated the questions involved in many forms, they resolve themselves into whether this fraudulent transaction was within the real or apparent scope of the agent's authority and whether the conduct of defendant firm either before or after the transaction constituted a ratification. Defendant firm in no way held out to plaintiff that the transaction was within the scope of Adams' authority. On the contrary, plaintiff must have known that it was outside of such scope, in spite of the ridiculous position that plaintiff takes that she was asked to finance some business of defendant firm. Moore, as plaintiff's agent, knew or should have known that the transaction was palpably fraudulent and plaintiff either as a principal or joint adventurer became a party to

the scheme, the real purpose of which was to defraud a client of defendants by making a fraudulent profit in which plaintiff, Adams and defendants were to share. There can be no ratification, where all material elements of the transaction are not fully known. Plaintiff cannot, as a matter of law, charge the defendant firm with the fraudulent misconduct of Adams. Nor can plaintiff hold the surety on the bond, as the blue sky law was intended to afford protection only to innocent members of the public. The judge was correct in entering a judgment *non obstante veredicto*.

The judgment is affirmed, with costs to defendants.

NORTH, C. J., and FEAD, WIEST, BUSHNELL, SHARPE and TOY, JJ., concurred. POTTER, J., did not sit.